Randolph B. Neal, ISB #6565
NEAL LAW PLLC
482 Constitution Way, Suite 222
Idaho Falls, ID  83402
(208) 206-5485  FAX (208) 419-3474
Neal.Law@att.net
*Attorney for Plaintiff David Harper*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO
## Southern Division

DAVID HARPER,

  *Plaintiff,*

  v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, SECRETARY OF THE
INTERIOR DEBRA ANNE HAALAND,
MICHAEL NEDD, KEVIN GRAHAM
AND JOHN DOES I – XII

  *Defendants.*

CASE NO.  1:21-CV-197

JURY TRIAL DEMANDED

## COMPLAINT IN A CIVIL CASE

  COMES NOW, Plaintiff, DAVID HARPER, by and through counsel Randolph B. Neal, ISB #6565, and for causes of action allege and would respectfully show the Court as follows:

### PARTIES TO THIS COMPLAINT

  1. This action is brought by the Plaintiff David Harper, an individual who is a resident of the County of Jerome, state of Idaho and a citizen of Idaho.

Name: David Harper
Job Title: Outdoor Recreation Planner
Street Address: 601 Pioneer Mountain Loop
City and County: Jerome, Jerome
State and Zip Code: Idaho, 83338
Telephone Number: 208-308-8225
Email Address: westernwaterfowl@hotmail.com

2.      Defendant United States DEPARTMENT OF THE INTERIOR is a duly established department of the Executive Branch of the United States federal government and whose operations primarily originate from the city of Washington, in the District of Columbia, and includes the bureau known as the Bureau of Land Management.

Name: Department of the Interior
Street Address: 1849 C Street NW
City and County: Washington DC
State and Zip Code: Washington DC 20240
Telephone Number: 202-208-3100

3.      Defendant Secretary of the Interior DEBRA ANNE HAALAND is the head of the Defendant Department of the Interior who is responsible for its operations with her primary place of business in the city of Washington, in the District of Columbia. The Secretary of the Interior is named in her official capacity.

Name: The Honorable Debra Anne Haaland
Job Title: Secretary of the Interior
Street Address: 1849 C Street NW
City and County: Washington DC
State and Zip Code: Washington DC 20240
Telephone Number: 202-208-3100
Email Address: secretary_of_the_interior@ios.doi.gov

4.      Defendant MICHAEL NEDD was at all relevant times an employee of the Bureau of Land Management ("BLM"), U.S. Department of the Interior, who at relevant times was assigned to the Washington Office as Deputy Director of Operations for the

COMPLAINT                    Page 2 of 25

BLM. Defendant is named in his official capacity, but as to actions complained upon which fall outside the scope of his employment, in his individual capacity.

> Name: Michael Nedd
> Job Title: Deputy Director Operations BLM
> Street Address: 760 Horizon Drive
> City and County: Grand Junction, Mesa County
> State and Zip Code: Colorado 81506
> Telephone Number: 202-208-3801
> Email Address: mnedd@blm.gov

5.      Defendant KEVIN T. GRAHAM was at all relevant times an employee of the BLM, U.S. Department of the Interior, who at relevant times was assigned to the Washington Office Division of Policy and Programs for the BLM. Defendant is named in his official capacity, but as to actions complained upon which fall outside the scope of his employment, in his individual capacity.

> Name: Kevin Graham
> Job Title: Acting Division Chief Human Resource Policy and Programs
> Street Address: 9828 N 31st Ave
> City and County: Phoenix, Maricopa County
> State and Zip Code: Arizona 85051
> Telephone Number: 602-906-5671
> Email Address: ktgraham@blm.gov

6.      Defendants JOHN DOES I – XII are unknown individuals, supervisors, managers, employees, agents and/or government entities which may bear liability, but are not yet identified, but may become identified through the discovery process.

JURISDICTION AND CONSTITUTIONAL INTERESTS

7.      This is a civil action brought in part pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). The Court has jurisdiction over the subject matter of these claims pursuant to Title 28 United States Code ("USC") §§ 1331, 1343, 1367, 2201.

8.     Venue of this suit lies in the United States District Court for the District of Idaho, because the defendants, or some of them, currently conduct business in the District of Idaho, and the witnesses reside and the activities largely took place in Idaho where the Plaintiff is assigned.

9.     This action arises under the United States Constitution, particularly under the provisions of the Fifth Amendment to the Constitution and under federal law, particularly Title 42 U.S.C. §1983 in that (a) Defendants were federal employees holding positions in government as officers under the color of law; and (b) Plaintiff has constitutionally protected interests in his liberty.

10.     The acts of the Defendants alleged herein to be in violation of Title 42 U.S.C. § 1983 were deliberately undertaken and ratified by the Defendants and each of them, individually and under color of the statutes, ordinances, regulations, policies, customs and usages of Defendants United States Department of the Interior and under the authority of their offices as employees of United States Department of the Interior.

11.     Pursuant to 28 U.S.C. § 1367, in any civil action of which the district court have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## STATEMENT OF FACTS

12.     Plaintiff realleges paragraphs one through eleven in this Complaint and incorporates them here as if set forth in full.

BACKGROUND

13.     On June 12, 2018, David Harper, who was at the time a Law Enforcement Ranger in the Twin Falls District, BLM, was interviewed by an Interior Department Office of Inspector General ("OIG") Special Agent concerning allegations against the Associate District Manager, Southern Nevada District, BLM, that he sexually harassed a former BLM employee by sending pornographic images and sexually suggestive messages via his personal phone and government computer.

14.     1The results of the investigation were summarized in OIG Report No. 0101-180565-1, dated September 26, 2018, and submitted to Brian Steed, then Deputy Director for Policy and Programs for any action deemed appropriate.

15.     On February 13, 2019, BLM Employee Relations ("ER") National Policy Specialist Kevin Graham sent a draft proposal for a 14-day suspension of Ranger Harper to Tammy Bergbauer with instructions to adopt as her own and review the evidence that was relied upon to make the proposed action. Prior to this it appears Bergbauer had not reviewed the evidence or participated in drafting of the proposed action.

16.     In March, 2019, an email from ER Specialist Kevin T. Graham to a new proposing official, Robert Casias, indicates that the "proposed action" was "increased to a removal."

17.     It is unclear who was behind the decision referred to in this email, but Graham, asks Robert Casias, who was Associate Director of the BLM National Operations Center, in an email dated March 25 to "adopt this proposal as [his] own."

18.     Mary Huber-Thompson, Human Relations ("HR") Specialist/Employee and Labor Relations/Assistant Ethics Counselor for the BLM Idaho State Office then inquired

whether William Woody, director of BLM's Office of Law Enforcement and Security ("OLES") was "included in the decision to propose removal?"

19.     Graham's response was that the proposal was "taken over" by the BLM "front office."

20.     It is not clear who Graham is referring to as the "Front Office," as no one is identified by name.

21.     Additionally, it is unclear why the Division of HR Policy and Programs ("WO-710") was assigned instead of the Office of WO HR Services ("WO-712").

22.     On March 27, 2019, Robert Casias issued the "Advanced Notice of Proposal Removal" which proposed Ranger Harper's removal from the Service.

23.     An administrative investigation would later find that no direct line BLM managers or supervisors were contacted prior to the issuance of the proposed and final decision of discipline.

24.     It is unclear why Mr. Casias was chosen or who from the "front office" was steering the decisions.

25.     However, since  Mr. Woody was only "made aware" of the proposed action, and then given assignments, the decision likely came from higher up his chain of command.

26.     Since William Woody at the time was answering directly to Michael Nedd, the Deputy Director of Operations, it is apparent that Mr. Nedd was the decision maker and was simply hiding behind Mr. Casias to disguise the fact.

27.     The only other higher authority was Deputy Director of Policy and Programs William Perry Pendley.

28.    Apparently, other than Ranger Harper's own responses to the Proposed Decision, the written transcript of the June 12, 2018, OIG interview was the only information used in preparing the proposed and final decisions.

29.    There is nothing in the "relied upon" materials that even suggests the OIG complained that Ranger Harper had somehow lacked candor, and the information used from Ranger Harper's interview was used to substantiate the conduct of the primary subject, and thus the interview had not "omitted or concealed" any material facts.

30.    The proposal claimed that Ranger Harper had showed a lack of candor in his interview with the OIG.

31.    The OIG was not investigating Ranger Harper and never found him to be engaged in any wrongdoing, or even any accusations of wrongdoing.

32.    In his response, Ranger Harper explained he did not always understand the context or focus of Special Agent Shillingford's questions and that a poor cell phone connection was at least partially to blame for misunderstandings concerning the questions asked.

33.    These misunderstandings were identified as the interview progressed and Ranger Harper corrected any misconceptions before the interview was concluded.

34.    On May 2, 2019, Plaintiff presented an oral response via conference call.

35.    Ranger Harper was told his time was limited to one hour.

36.    ER Specialist Graham initiated the call and ran the meeting.

37.    ER Specialist Graham outlined the rules of response and stated Ranger Harper's attorney would not be allowed to speak.

38.    Mr. Berger, the Plaintiff's Attorney at the time, and ER Specialist Graham argued for approximately 20 minutes.  Ms. Eggers demanded that the response proceed.

39.    Ranger Harper's response was cut off when original hour limit hits, limiting the time for an oral response to approximately 30 minutes, denying him a meaningful chance to respond.

40.    There is no explanation why Ms. Eggers was designated. She did not supervise Ranger Harper or Mr. Casias. She described her duties as "providing oversight and leadership for all activities relating to the administration of the lands under the Eastern States Office jurisdiction." Ranger Harper was unquestionably outside this jurisdiction.

41.    Nevertheless, on May 21, 2019, Ms. Eggers issued a decision to suspend Ranger Harper for 14 days without pay and permanently reassign him to non-law enforcement duties.

42.    The sole basis for this penalty was the first charge of lack of candor.

## "BRADY BRANDING"

43.    Federal agencies either force a transfer or even revoke the officer's delegation/commission when they have a sustained charge of lack of candor. This is known in law enforcement as "Brady Branding."

44.    Brady Branding is especially malicious because it can sidestep the intended due process protections for employees normally ensured by MSPB review when the agency seeks removal from the federal service.

45.    If factual allegations of dishonesty are used up front to support termination, then the employee can challenge their veracity and an MSPB Administrative Judge could

find the termination was not supported.

46.     However, if the agency instead relies upon the finding that the employee is not fit for a law enforcement designation or can no longer perform his duties due to the "independent" decision of the federal prosecutor, the AJ is unlikely to disturb those conclusions.

47.     This case is an obvious attempt at Brady Branding. It is not a simple coincidence that the specific language "lack of candor" was used in this proposal.

48.     According to the MSPB's *Fargnoli* case, lack of candor generally requires that an agency prove two elements: (1) the employee gave incorrect or incomplete information; and (2) the employee did so knowingly.

49.     There is no support in the OIG report for finding that Ranger Harper provided information which he knew was incorrect or deceptively incomplete.

50.     This was explained in detail by Ranger Harper's attorney at the time in the written response to the proposed removal from the service.

MSPB APPELLATE RIGHTS

51.     Because the reassignment of Ranger Harper to non-law enforcement duties would necessarily result in a reduction in pay as he moved from the GL scale to the GS scale, the first decision letter explained that Ranger Harper could appeal this decision to the Merit Systems Protection Board ("MSPB").

52.     The first reassignment letter which was issued the day after the decision letter in fact showed that Ranger Harper was to be reassigned to a position which would have paid him about $2000 less a year.

53.     In an apparent effort to avoid MSPB jurisdiction, just over two weeks later

(during his suspension period) a second letter was issued without explanation.

54.    It is interesting to note that the second re-assignment letter appeared to give Ranger Harper a raise. However, the GL-1801-09 step 1 amount is different than that listed in the May 21 reassignment.

55.    Further evidence that this change in the reassignment documents was intended to circumvent MSPB jurisdiction is found  in the conclusion of the two documents. In the May 21 document, the MSPB appeal is specifically mentioned, while in the June 5 document, mention of the MSPB disappears.

56.    An MSPB appeal by Ranger Harper was in fact dismissed for lack of jurisdiction.

57.    It is unclear where the authority for Kevin Graham to make a Directed Reassignment came from. No other name is mentioned.

ADMINISTRATIVE GRIEVANCE

58.    When Ranger Harper received notice that the MSPB was dismissing his appeal based on jurisdiction, he submitted a grievance appealing the Eggers decision to the Idaho State office of BLM.

59.    The grievance was accepted and on July 31, Ranger Harper gave an oral presentation to John Ruhs, BLM Idaho State Director.

60.    On or about July 17, 2019, Ruhs appointed Howard Hedrick to investigate the administrative grievance.

61.    Mr. Hedrick prepared a report dated August 30, 2019.

62.    In his report, Hedrick found that the actions of the Washington office were "completely lacking in ethical behavior and morally wrong."

63.    Mr. Hedrick also concluded that there was no credible evidence to sustain the charge of lack of candor.

64.    Mr. Ruhs was in Washington D.C. September 12-13 and he met with Mr. Nedd and the acting director of the Office of Law Enforcement and Security.

65.    In September, 2019, Ranger Harper was told the State Director was ready to issue a decision in his favor and that the investigation was in Ranger Harper's favor with multiple accounts of wrongdoing on the part of the Bureau.

66.    On or about September 17, 2019, a memorandum was issued from Deputy Director Nedd to Idaho State Director Ruhs directing him to cease all action on the grievance.

67.    Deputy Director Nedd then assumed jurisdiction and appointed himself as deciding official, with the original ER Specialist (Graham) as the HR officer and point of contact.

68.    Mr. Nedd stated that this was consistent with 370 DM 771 paragraph 1.10(B). This citation does not conform with the 2015 issuance of this manual.

69.    While the grievance manual does give authority to the Director of the Office of Human Capital for the Department of the Interior to assume responsibility for a grievance, there is no basis for the Deputy Director of BLM to assume authority to designate himself as a deciding official once he had received notice of the intended decision by the previously designated deciding official.

70.    In his decision, Mr. Nedd made no mention that an investigative report regarding the grievance had been completed.

71.    No copy of the report was provided to Ranger Harper to include in his

response.

72.     When Ranger Harper requested a copy of the Hedrick report, he was told he would have to make a FOIA request.

73.     On October 2, 2019, Ranger Harper made a specific FOIA request for Howard Hedrick's report.

74.     Ranger Harper arranged to provide an oral response to Deputy Director Nedd personally in Washington D.C. on October 29, 2019, which was limited to 30 minutes, therefore not providing enough time for a meaningful response.

75.     On November 19, 2019, Mr. Nedd issued a decision on Harper's "Step 2 administrative grievance."

76.     In his decision, Mr. Nedd makes no mention of the Hedrick investigation. He also states that Ranger Harper had "provided no information that contradicts the finding of the deciding official or otherwise causes me to question the 14-day suspension or reassignment to a non-LEO position," even though Mr. Nedd had been specifically made aware of the Hedrick report.

77.     Mr. Nedd did not disclose whether the original grievance decision by the Idaho State Director was contrary to the decision he subsequently made.

78.     Mr. Nedd also did not disclose any prior involvement with the matter. Mr. Nedd stated that his decision on Ranger Harper's administrative grievance was "final and not subject to further review."

79.     At the end of the letter, Deputy Director Nedd states that though he denied the grievance, nothing precluded Ranger Harper from applying for and competing for future law enforcement vacancies.

DISCLOSURE OF THE HEDRICK REPORT

80.     In November, 2019, the Bureau of Land Management stated that they found 78 pages of responsive documents from the BLM, Washington Office and 43 pages of responsive documents from the Office of Inspector General.

81.     They denied that there had been any draft decisions by the Idaho State Director.

82.     Other than acknowledging the Hedrick report, they denied that there were any other documents related to Harper's grievance prior to Mr. Nedd's memo designating himself as the deciding official.

83.     The BLM stated that Ranger Harper would receive any identified documents directly from the Washington Office or from the OIG.

84.     When Ranger Harper did not receive these documents, he hired an attorney and filed a FOIA lawsuit against the Department of the Interior. This lawsuit is still pending, however, on April 7, 2020, the Bureau of Land Management released major portions of the Hedrick investigation to Ranger Harper.

THE HEDRICK REPORT

85.     Mr. Hedrick's report raises several concerns about the way Ranger Harper's case was handled. Mr. Hedrick attempted to interview individuals who were directly involved in the proposal and decision.

86.     When Mr. Hedrick contacted Mr. Graham, he initially agreed to an interview, however he then declined all attempts at an interview.

87.     The Deciding Official, Ms. Eggers, who has subsequently been promoted to an Assistant Director position answering directly to Mr. Nedd, initially agreed to an interview on August 19.

88.     She stated she might not be able to answer all of Mr. Hedrick's questions because of a "settlement agreement." There is no settlement agreement in the Harper matter.

89.     When Mr. Hedrick asked Ms. Eggers who had asked her to serve as the deciding official she immediately declined to answer and said the interview was "over."

90.     Mr. Hedrick also interviewed the proposing official, Mr. Robert Casias. He stated that he was asked to be the proposing official by Kevin Graham.

91.     Mr. Casias stated that he only reviewed the OIG transcript prior to issuing the proposal.

92.     Mr. Casias said that he did not interview anyone else.

93.     Mr. Casias claimed, despite the email to the contrary discussed above, that he alone had decided on and had prepared the proposed removal.

94.     Mr. Hedrick also interviewed Mr. Hone who is the head of the BLM Office of Professional Responsibility which pursuant to BLM General Order 38 is responsible for investigating alleged misconduct by BLM law enforcement officers.

95.     He stated that after receiving a copy of the OIG report, that he had contacted Special Agent ("SA") Shillingford from OIG to follow up with him specifically about the interview of Ranger Harper.

96.     SA Shillingford stated that he believed the changes in Harper's responses to various questions were a result of his working through his questions and his method

of conducting an interview.

97.    SA Shillingford stated that he would clarify a previous question with a slightly different question meaning "here's what I'm really asking."

98.    SA Shillingford told Hone that if he felt there was a lack of candor on the part of Harper, he would have highlighted it in his report, which he did not.

99.    Mr. Hedrick also found that none of Ranger Harper's supervisors or managers were contacted concerning this proposed disciplinary action.

DIRECTED REASSIGNMENT

100.    On June 9, 2019 Ranger Harper reported for duty as an Outdoor Recreation Planner in the Burley Field Office approximately 45 miles from his residence.

101.    This reassignment now requires approximately a 50–60-minute commute, and a requirement to report to the office daily.

102.    His previous position was as a Twin Falls District employee with the office approximately 8.5 miles from his residence with a domiciled vehicle and no requirement to report to the physical office every day.

103.    Policy for Office of Law Enforcement and Security personnel to domicile a vehicle is a maximum distance of 35 miles from office.

REQUEST FOR REVIEW OF GRIEVANCE PROCEDURE

104.    On December 11, 2019, Ranger Harper met with Idaho State Director John Ruhs, who stated that the way things were handled was incorrect and there was high level interference from the beginning.

105.    State Director Ruhs confirmed he was going to overturn the decision, grant Ranger Harper's grievance request and that Howard Hedrick's administrative inquiry

sided in with Ranger Harper.

106.    State Director Ruhs stated he fully supported Ranger Harper as a BLM LEO in his state. Similarly, local district management stated their support for Ranger Harper based on the Hedrick Report findings.

107.    On April 21, 2020, Ranger Harper requested a review of the grievance violations by the Deputy Secretary of the Interior and human resources officials at the Department level.

108.    On September 14, 2020, Jennifer Ackerman, the Director of the Department's Office of Human Capital and Deputy Chief Human Capital Officer stated that she found the BLM had followed the appropriate processes in the administrative grievance procedure, without any further analysis.

APPLICATION FOR RETURN TO LAW ENFORCEMENT POSITION

109.    On or about May 21, 2020, Ranger Harper applied to a competitive job vacancy for a Field Staff Law Enforcement Ranger in the Twin Falls Office. Job Vacancy number- ID-Merit-2020-0068.

110.    On June 3, 2020, Ranger Harper was notified he was referred to the hiring official as best qualified.

111.    On or about July 15, 2020, Ranger Harper is offered a tentative job offer for the Field Staff Law Enforcement Ranger in Twin Falls.

112.    On August 11, 2020, Ranger Harper accepts a final offer for the Field Staff Law Enforcement Ranger position in Twin Falls. Start date set for August 30, 2020.

113.    Ranger Harper was told that he had passed a NOC background check.

114.    On or about August 17, 2020, Ranger Harper is informed that the NOC is

doing a second review and that Deputy Director Nedd had gotten involved. Both Nedd and Graham call the NOC and the Idaho State Director's Office.

115.    On or about August 21, 2020, Ranger Harper's job offer was rescinded, citing an unknown and never before disclosed "OPR report."

116.    The NOC memo states Ranger Harper is not entitled to see the memo nor does he have appeal rights.

117.    Since that time, Ranger Harper has applied to other law enforcement positions with land management agencies and has not been able to return to his law enforcement career.

118.    Ranger Harper has received feedback that these actions have affected his reputation and that has affected his ability to return to his law enforcement career.

COUNT I
*Violation of Civil Rights Under Color of Law*
*(Violation of Liberty Interests)*

119.    Plaintiff realleges paragraphs one through one hundred eighteen in this Complaint and incorporates them here as if set forth in full.

120.    Defendants Department of the Interior, Secretary of the Interior, Michael Nedd, Kevin Graham, and John Does in violation of the Department's own personnel policies intentionally committed the following due process violations:

a.    The process did not involve objective decision makers from proposal to decision to grievance. BLM "front office" and Kevin Graham was involved at every stage.

b.    Graham's drafting of documents then presenting for concurrence and asking for signatures did not represent an objective decision making.

c. There is reason to believe ex-parte communications took place at various stages of actions that put undue pressure on proposing and deciding officials to find a predetermined outcome.

d. This pressure was so substantial it likely caused prejudice which denied Ranger Harper a fair process.

e. Public employees are entitled to other procedural protections afforded to them by statute, regulation, or agency procedure.

f. Mr. Nedd and Mr. Graham disrupted and improperly restricted Ranger Harper's right to representation.

g. Mr. Nedd and Mr. Graham disrupted and improperly restricted Ranger Harper's right to reasonable opportunity for response.

h. Mr. Nedd and Mr. Graham violated policy concerning discipline outside of state organization, in HR writing and proposing actions, and/or in direction coming from outside proposing or deciding official process.

i. The Defendants violated departmental policy in General Order 38's requirement for OPR involvement in alleged LEO misconduct.

j. The Defendants violated policy in circumventing OLES involvement as required in the BLM's General Orders.

k. The Defendants violated due process by changing the proposing official and change the proposing document without addition of new evidence, to increase the seriousness or additional charges.

l. Due process was violated when false statements were used in charging documents.

m. Due process was violated when statements were intentionally used out of context in a misleading way in the charging documents.

n. Due process was violated when allegations were made in charging documents without any supporting evidence.

o. Defendants Michael Nedd and Kevin Graham violated policy by assuming the deciding official role over the grievance outside of authority

p. Defendants Michael Nedd and Kevin Graham violated policy and procedure when a decision had been made by the grievance official and they stripped the authority away because they did not like his decision.

q. Defendants Michael Nedd and Kevin Graham violated due process by concealing the results of the Howard Hedrick investigation.

r. Defendants Michael Nedd and Kevin Graham violated due process by interfering with hiring during an open and competitive process.

121.   Defendants' actions and omissions have damaged Plaintiff's reputation, honor or integrity in such a way as to brand him as a law enforcement officer who lost his job because of moral turpitude and has effectively prevented him from following his trade and calling as a law enforcement officer.

122.   The actions and omissions of the Defendants, resulted in the deprivation of Plaintiff's property and liberty interests in his law enforcement career in violation of his constitutional rights, privileges and immunities as guaranteed by the Constitution of the United States and more particularly, the Fifth Amendment to the Constitution of the United States.

123.   As a direct and proximate result of the Defendants' violations of Plaintiff's

constitutional rights, privileges and immunities, as aforesaid, Plaintiff suffered, and will continue to suffer, mental pain, discomfort and other anxieties, for which the actors are liable for general damages in a reasonable sum.

124.   As a further direct and proximate result of the Defendants' violation of Plaintiff's constitutional rights, privileges or immunities, as aforesaid, Plaintiff has incurred economic losses, including, but not limited to, lost income, and has otherwise incurred losses, expenses and costs, and the Defendants are liable for special damages in a reasonable sum, together with such other expenses and costs as may be incurred hereafter.

125.   As a further direct and proximate result of the Defendants' violation of Plaintiff's constitutional rights, privileges or immunities, as aforesaid, Plaintiff has incurred attorney's fees, litigation expenses and taxable costs, all to his damage in a reasonable sum, together with such other attorneys' fees, litigation expenses and taxable costs as may be incurred hereafter.

126.   The Plaintiff reserves the right to show that the acts and omissions of the Defendants in violation of Plaintiff's constitutional rights, privileges or immunities, as aforesaid, were made knowingly, intentionally, maliciously or with reckless or callous disregard for Plaintiff's rights, by reason of which, Plaintiff is entitled upon granting of a motion by the Court to an award of punitive damages in a reasonable sum.

## COUNT II
*Defamation*

127.   Plaintiff realleges paragraphs one through one hundred twenty-six in this Complaint and incorporates them here as if set forth in full.

128.   Defendants communicated information concerning the Plaintiff to others.

129.    The information impugned the honesty, integrity, virtue or reputation of the Plaintiff and/or exposed the Plaintiff to public contempt or ridicule.

130.    The information was false.

131.    The Defendants knew it was false, or reasonably should have known that it was false.

132.    Because the information constituted defamation per se, the Plaintiff is deemed to have been injured by the defamation in this case, and the Plaintiff need not prove actual injury in order to recover damages.

133.    As a direct and proximate result of the Defendants' defamation of Plaintiff, Plaintiff suffered loss of liberty, and suffered, and will continue to suffer, mental anguish, discomfort and other anxieties, for which the actors are liable for general damages in a reasonable sum.

134.    As a further direct and proximate result of the Defendants' defamation of Plaintiff, as aforesaid, Plaintiff has incurred economic losses, including, but not limited to, lost income, and has otherwise incurred losses, expenses and costs, and the Defendants are liable for special damages in a reasonable sum, together with such other expenses and costs as may be incurred hereafter.

135.    As a further direct and proximate result of the Defendants' defamation of Plaintiff, as aforesaid, Plaintiff has incurred attorney's fees, litigation expenses and taxable costs, all to her damage in a reasonable sum, together with such other attorneys' fees, litigation expenses and taxable costs as may be incurred hereafter.

COUNT III
*Negligent Supervision*

136.   Plaintiff realleges paragraphs one through one hundred thirty-five in this Complaint and incorporates them here as if set forth in full.

137.   Defendant Secretary of the Interior and United States Department of the Interior owed the duty to every person in our society to use reasonable care to avoid legal injury to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such legal injury.

138.   Defendants owed a duty to the Plaintiff to supervise their agents, to ensure they acted with due caution, prudence and circumspection.

139.   Defendants materially breached that duty through negligent supervision.

140.   As a direct and proximate result of the Defendants' violations of their duty to Plaintiff, Plaintiff suffered loss of liberty, and suffered, and will continue to suffer, mental anguish, discomfort and other anxieties, for which the actors are liable for general damages in a reasonable sum.

141.   As a further direct and proximate result of the Defendants' breaches of their duty owed to Plaintiff, as aforesaid, Plaintiff has incurred economic losses, including, but not limited to, lost income, and has otherwise incurred losses, expenses and costs, and the Defendants are liable for special damages in a reasonable sum, together with such other expenses and costs as may be incurred hereafter.

142.   As a further direct and proximate result of the Defendants' breach of their duty owed to Plaintiff, as aforesaid, Plaintiff has incurred attorney's fees, litigation expenses and taxable costs, all to her damage in a reasonable sum, together with such other attorneys' fees, litigation expenses and taxable costs as may be incurred hereafter.

COUNT IV
*Negligent Training*

143.   Plaintiff realleges paragraphs one through one hundred forty-four in this Complaint and incorporates them here as if set forth in full.

144.   Defendants Secretary of the Interior and Department of the Interior owed the duty to the Plaintiff to use reasonable care to avoid legal injury to anyone in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such legal injury.

145.   Defendants owed a duty to the Plaintiff to train their agents and employees to act with due caution, prudence and circumspection.

146.   Defendants materially breached that duty through negligent training.

147.   As a direct and proximate result of the Defendants' violations of their duty to Plaintiff, Plaintiff suffered loss of liberty, and suffered, and will continue to suffer, mental anguish, discomfort and other anxieties, for which the actors are liable for general damages in a reasonable sum.

148.   As a further direct and proximate result of the Defendants' breaches of their duty owed to Plaintiff, as aforesaid, Plaintiff has incurred economic losses, including, but not limited to, lost income, and has otherwise incurred losses, expenses and costs, and the Defendants are liable for special damages in a reasonable sum, together with such other expenses and costs as may be incurred hereafter.

149.   As a further direct and proximate result of the Defendants' breach of their duty owed to Plaintiff, as aforesaid, Plaintiff has incurred attorney's fees, litigation expenses and taxable costs, all to her damage in a reasonable sum, together with such other attorneys' fees, litigation expenses and taxable costs as may be incurred hereafter.

PRAYER FOR RELIEF

Because Defendants have engaged in the acts and practices described above, Defendants have violated the law as alleged in this Complaint and Defendants have caused injury, loss and damage to the Plaintiff, for which the Plaintiff must be made whole.

WHEREFORE, Plaintiff David Harper prays that Defendants be cited according to law to appear and answer herein.

In addition, Plaintiff David Harper respectfully prays that this Court adjudge against Defendants civil penalties on each cause of action individually or concurrently in favor of the Plaintiff as follows:

1.   Reinstatement in law enforcement position with backpay;

2.   For general damages in a reasonable sum;

3.   For special damages in a reasonable sum for economic losses as set forth herein;

4.   For special damages in a reasonable sum for past and future lost wages;

5.   For reasonable attorney's fees, litigation expenses and taxable costs;

6.   For interest on items of special damage; and

7.   For such other and further relief as the court may deem proper and to which the Plaintiff may show itself entitled.

DEMAND FOR JURY TRIAL

The Plaintiff, pursuant to U.S. Const. Amend. VII and Federal Rules of Civil Procedure Rule 38, herewith respectfully demands a trial by jury on the facts alleged and the damages prayed for in the Complaint filed in the case referenced above.

RESPECTFULLY SUBMITTED, this 4th day of May, 2021.

_____
Randolph B. Neal, ISB #6565
Counsel for the Plaintiff David Harper
482 Constitution Way, Suite 222
Idaho Falls, ID  83402
(208) 206-5485  FAX (208) 419-3474
Neal.Law@att.net